**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**


KOURTNEY HAMEL,                              *

      **Plaintiff,**                              *

      **v.**                              *                  **CIVIL NO. JKB-16-2876**

**BOARD OF EDUCATION
OF HARFORD COUNTY,**                              *

      **Defendant.**                              *

    *     *     *     *     *     *     *     *     *     *     *     *

## <u>MEMORANDUM</u>

Kourtney Hamel ("Plaintiff") filed suit against her former employer, the Board of Education of Harford County ("Defendant"), alleging violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* (the "Rehabilitation Act") and Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"). Now pending before the Court is Defendant's Motion for Summary Judgment (ECF No. 31), seeking judgment as a matter of law as to Plaintiff's hostile-work-environment and failure-to-accommodate claims under the ADA and Rehabilitation Act. The issues have been briefed (ECF Nos. 31-1, 33, & 39), and no hearing is required, Local Rule 105.6 (D. Md. 2016). For the reasons explained below, Defendant's motion will be granted.

## *I.    Background*

Plaintiff has a medical condition known as Ehlers-Danlos Syndrome, "a group of inherited disorders that affect connective tissues, primarily skin, joints, and blood vessel walls." (Plf.'s Opp'n to Def. Bd. of Educ. of Harford Cty.'s Mot. for Summ. J., ECF No. 33, at 1.) Her

condition affects the stability of her joints and requires that she use crutches to assist her when walking. (*Id.*)

Plaintiff was previously employed by Defendant as a tenured elementary school teacher at Emmorton Elementary School ("EES") in Harford County. Plaintiff began working for Defendant in 2005 as a long-term substitute and later became a full-time teacher in 2006 and served in that role until her retirement in 2015. Plaintiff last attended work on August 28, 2013; she subsequently took a series of paid and unpaid leaves throughout the remainder of 2013 and 2014, and ultimately took disability retirement on January 31, 2015. (Def.'s Answers to Plf.'s First Set of Interrogs., ECF No. 33-4, ¶ 5.)

Plaintiff was initially quite happy with her employment conditions, however, that changed in the fall of 2010 with the appointment of Peter Carpenter, Ph.D., as Principal of EES. Notably, Plaintiff was not the only teacher at EES who felt that the school environment changed for the worse under Dr. Carpenter's tenure. Indeed, a number of her colleagues testified that Dr. Carpenter and Ms. Vohs, the Assistant Principal, created a cliquey environment in which certain teachers were treated more favorably than others. That said, Plaintiff and at least some of her colleagues believe that she was more disfavored by the administration than others and that she was specifically targeted because of her disability. (*See* Phillips Dep., ECF No. 33-1, at 160–61; Spector Dep., *id.* at 171–72; Elliott Dep., *id.* at 33–34.) She also contends that Defendant failed to grant her reasonable accommodations that would have allowed her to continue to work as a teacher.

### A. Plaintiff's Work Environment Under Dr. Carpenter

Plaintiff contends that Dr. Carpenter—almost from the moment he arrived at EES—embarked on a sustained campaign of harassment targeted at her because of her physical

disability.[1]  Dr. Carpenter (and Ms. Vohs) allegedly harassed Plaintiff by: excessively supervising her activities at school, making unsolicited inquiries into her medical condition, treating her rudely, changing school policies in a manner targeted to impede Plaintiff's work, designing school activities so as to exclude Plaintiff, and relocating Plaintiff's classroom on multiple occasions.

At the beginning of the 2010–11 school year, Dr. Carpenter's first at EES, Plaintiff provided Dr. Carpenter with two letters from her physical therapist requesting that she be allowed to use crutches and wear athletic shoes to provide stability in the wake of a hip surgery. (Def.'s Answers to Plf.'s First Set of Interrogs., ECF No. 31-2, at 119–20.)  Dr. Carpenter approved both requests.  (*Id.* at 120.)  Approximately two months later, in October 2010, Plaintiff met with Dr. Carpenter to tell him that she needed to take additional leave to continue to heal from her hip surgery. (Hamel Dep. Tr., *id.* at 65–67.)  During this meeting Plaintiff became very emotional about the prospect of leaving her students for an extended period of time.  (*Id.*) Immediately following the meeting, and in spite of Plaintiff's fragile emotional state, Dr. Carpenter conducted a formal evaluation of Plaintiff's teaching.  (*Id.*; Aff. Carpenter, *id.* at 128.)

Plaintiff takes issue not only with the timing of Dr. Carpenter's first formal evaluation of her, but also with the frequency of his informal oversight, which was far greater than that of his predecessor.  For instance, Dr. Carpenter visited Plaintiff's classroom daily as an informal check–in, which Plaintiff perceived as more frequent than his visits to other teachers' classrooms.  (Hamel Dep. Tr., *id.* at 58–62.)  Additionally, Dr. Carpenter observed Plaintiff in "day-to-day interactions" while doing "walk-throughs" and kept notes about Plaintiff—including

---

[1]    Defendant disputes many of Plaintiff's allegations.  When considering a motion for summary judgment, however, the facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing the motion for summary judgment. *Scott v. Harris,* 550 U.S. 372 (2007); *Iko v. Shreve,* 535 F.3d 225, 230 (4th Cir. 2008).  Accordingly, the facts and inferences to be drawn therefrom are taken in the light most favorable to Plaintiff.

when she was absent and when staff members assisted her—in a handwritten log he used to document information about EES generally. (Carpenter Dep. Tr., ECF No. 33-1, at 14.) Plaintiff also believes that Dr. Carpenter and Ms. Vohs surreptitiously read her personal plan book to learn more about her medical appointments. (*Id.* at 77.) And, on one occasion, another teacher observed Dr. Carpenter and Ms. Vohs standing alone in Plaintiff's classroom near her filing cabinet. (Neidhardt Dep. Tr., *id.* at 138–40.)

Dr. Carpenter also treated Plaintiff disrespectfully both in private and in front of other teachers. For example, Dr. Carpenter frequently glared at Plaintiff, pursed his lips, shook his head from side to side, and was dismissive of her comments during staff meetings. (Hamel Dep. Tr., *id.* at 72.; Phillips Dep. Tr., *id.* at 145–48.) On one occasion, while Plaintiff was discussing her vertigo with another teacher, Dr. Carpenter interjected himself into the conversation and asked, "Did the doctor even look in your ear?" (Hamel Dep. Tr., *id.* at 73–75.) When Plaintiff responded that he had, Dr. Carpenter's face turned red. (*Id.*) On another occasion, after Plaintiff told Dr. Carpenter that she was having a prototype prosthesis made specifically for her, Dr. Carpenter remarked that she "must love having her condition because of her love of science." (*Id.* at 66–67.) In yet another incident, one of Plaintiff's colleagues overheard Dr. Carpenter and Ms. Vohs mocking the name of Plaintiff's condition, although Plaintiff was not aware of this incident. (Howard Dep. Tr., *id.* at 114–16.) Finally, Plaintiff points to an incident when Dr. Carpenter chuckled while Plaintiff was ascending stairs with the aid of her crutches. (Hamel Dep. Tr., *id.* at 59–60.)

Plaintiff also believes that Dr. Carpenter and Ms. Vohs designed school events so as to exclude her from participating. For instance, Dr. Carpenter and Ms. Vohs orchestrated a choreographed "flash mob" dance for teachers to participate in during a student assembly;

Plaintiff was unable to participate fully in the event due to her disability. (Elliot Dep. Tr., *id.* at 35; Cox Dep. Tr., *id.* at 16–19; Phillips Dep. Tr., *id.* at 152, 159.) Dr. Carpenter and Ms. Vohs also planned team-building activities for teachers that were physical in nature, such as timed scavenger hunts. (Neidhardt Dep. Tr., *id.* at 142; Spector Dep. Tr., *id.* at 167–68.) Again, Plaintiff was not able to participate fully in these events due to her disability. On one such occasion, Dr. Carpenter asked Plaintiff, "Don't you want to try?" (Maranto Dep. Tr., *id.* 123–24.)

In addition to excluding her from events, Plaintiff believes that Dr. Carpenter actively sought to make her job more difficult by moving her classroom and modifying school policies in a way that disproportionately affected Plaintiff. In the four years prior to Dr. Carpenter's arrival at EES, Plaintiff occupied the same classroom on the third floor of the school. (ECF No. 31-2, 115–16.) For the 2011–12 school year, Dr. Carpenter's second at EES, he relocated Plaintiff's classroom to the ground floor so that Plaintiff and her students would have direct access outside in the event of an emergency. (*Id.*) Plaintiff remained in this room the following year. Prior to the 2013–14 academic year, Dr. Carpenter reassigned Plaintiff from the fourth grade to the third grade. (*Id.*) As part of this reassignment, Dr. Carpenter moved Plaintiff's classroom back to the third floor so that she would be grouped with other third grade teachers. (*Id.*)

Plaintiff also contends that Dr. Carpenter changed or applied certain school policies with discriminatory intent. In February 2013, Dr. Carpenter instituted a new policy requiring all teachers to retrieve their own mail from the school mailroom. (The Friday Flyer, ECF No. 33-2, at 46.) Previously, teachers and students had been allowed to retrieve mail for other teachers. (Hamel Dep. Tr., ECF No. 33-1, at 84–86.) Plaintiff had often relied on the assistance of her colleagues and students to get her mail because it was difficult for her to carry mail while using

her crutches. (*Id.*) In addition, Dr. Carpenter reinforced a policy requiring teachers to supervise and escort children at all times throughout the building. (*Id.* at 87–89.) Under the previous administration, Plaintiff had occasionally requested that another teacher supervise her students on the stairs while she took the elevator. (*Id.*) Furthermore, Plaintiff believes that Ms. Vohs, who served as the EES state-standardized testing coordinator in 2012 and 2013, targeted her when she changed school policy regarding the distribution of standardized testing materials. Previously, the testing coordinator had distributed testing materials to individual teachers' classrooms; however, Ms. Vohs instituted a new policy requiring that all teachers personally pick up their testing materials from her. (Vohs Dep. Tr., *id.* at 201–02.) Multiple teachers attempted to retrieve Plaintiff's testing materials for her and Ms. Vohs prevented each one (except Elizabeth Steinen) from doing so. (Steinen Dep. Tr., *id.* at 184–85; Neidhardt Dep. Tr., *id.* at 136–37; Maranto Dep. Tr., *id.* at 127–29; Ellenby Dep. Tr., *id.* at 21–22.) Finally, Plaintiff contends that Defendant "disproportionately applied existing school policy concerning when doctor's notes were required." (ECF No. 33, at 6.) In support, Plaintiff cites to one occasion when Plaintiff told Dr. Carpenter and Ms. Vohs that she anticipated being out for three consecutive days and they asked her to provide a doctor's note explaining her absence upon her return. (Hamel Dep. Tr., *id.* at 89–91.)

In the spring and fall of 2012, Dr. Carpenter and Ms. Vohs made multiple inquiries into Plaintiff's health, conduct that Plaintiff contends was inappropriate and designed to harass her. First, during an evaluation conference on February 16, 2012, Dr. Carpenter and Ms. Vohs suggested that Plaintiff's physical therapy appointments were affecting her job and asked if she

needed any accommodations. Plaintiff indicated that she did not need any accommodations.[2] (Plf.'s Answers to Def.'s First Set of Interrogs., ECF No. 33-5, at 13.) Second, on October 23, 2012, Dr. Carpenter asked Plaintiff whether she needed any assistance because she was not using one of her feet during a classroom observation. (Email from Carpenter to DeHoff, Oct. 23, 2012, 11:12 a.m., ECF No. 33-2, at 17; Def.'s Answers to Plf's First Set of Interrogs., ECF No. 33-4, at 12.) Plaintiff again indicated that she did not need any accommodations. (*Id.*) Later, on December 4, 2012, during the course of a performance review, Dr. Carpenter and Ms. Vohs again asked Plaintiff about her health and if she needed any assistance or accommodations. (Hamel Dep. Tr., ECF No, 33-1, at 97–99; ECF No. 33-4, at 12–13.) Dr. Carpenter also told Plaintiff that she should not be "ashamed" of her condition. (*Id.*) Again, Plaintiff indicated that she did not need any accommodations. (*Id.*)

Another representative of Defendant also inquired into Plaintiff's health and asked if she needed any accommodations. This inquiry was triggered by an incident in which Plaintiff was injured at work. On May 24, 2012, Plaintiff suffered an injury to her shoulder and leg when a chair she was sitting on collapsed. (Vohs Aff., ECF No. 31-2, at 152–53; Supervisor's Accident Investigation Report, ECF No. 33-2, at 2; Vohs Dep. Tr., ECF No. 31-2, at 210.) The next day Plaintiff reported the incident to Ms. Vohs, who completed an Accident Investigation Report. (*Id.*) In the course of completing the report, Ms. Vohs asked Plaintiff if she had any preexisting conditions, and Plaintiff responded that she was "hypermobile." (Vohs Dep. Tr., ECF No. 31-2, at 213.) Ms. Vohs later met with Dr. Carpenter regarding the incident and, at the direction of the Board's Risk Management Department, they amended the form to mark Plaintiff's preexisting condition as "Ellers"—a misspelling of Ehlers-Danlos Syndrome. (*Id.* at 213–14; ECF No. 33-2,

---

[2]     In addition to Plaintiff, Ms. Vohs, and Dr. Carpenter, Margaret Weinbeck attended this meeting. Ms. Weinbeck did not recall any conversation about Plaintiff's health or disability during the meeting. (Weinbeck Dep. Tr., ECF No. 33-1, at 204–05.)

at 2.)  Shortly after Plaintiff's injury, Dr. Carpenter submitted a "Request for Fitness for Duty Examination" regarding Plaintiff to Kathy Dehoff, Defendant's Medical Case Manager.  As grounds for the request, Dr. Carpenter noted that Plaintiff had a degenerative condition that affected her mobility and that he was concerned about her ability to safely evacuate students in an emergency.  (Request for "Fitness for Duty" Examination, ECF No. 31-2, at 138–40; Carpenter Aff., *id.* at 130.)  Ms. Dehoff denied the request; however, she and Dr. Carpenter continued to communicate privately about Plaintiff's health and, in particular, whether her condition posed a safety risk should she need to help evacuate students in an emergency. (Emails between Kathy DeHoff and Peter Carpenter, ECF No. 33-2, at 13–19.)  Plaintiff was not aware of these communications.

Following Dr. Carpenter's request, at the June 2012 meeting of Defendant's Risk Management Department's Case Management Team ("CM Team"), the CM Team concluded that Melanie Wernig, Defendant's Risk Manager at the time, should contact Plaintiff to determine whether Plaintiff needed any accommodations.  Ms. Wernig contacted Plaintiff on July 5, 2012, to ask if she needed any accommodations; Plaintiff responded that she did not. (Wernig Aff., ECF No. 31-2, at 239.)

### B.  *Plaintiff's Requests for Accommodation*

As described *supra*, Defendant and its employees asked Plaintiff on multiple occasions if she needed any accommodations.  Each time, Plaintiff rebuffed them and insisted that she could fully perform her job without any assistance.  Despite this history, Plaintiff did eventually ask for several accommodations from Defendant.

On May 14, 2013, Plaintiff's attorney sent a letter to Defendant requesting that: (1) Plaintiff be placed in a classroom closer to her team members and nearer to the elevator; (2) Dr. Carpenter

and his staff be instructed to cease and desist making inappropriate comments and inquiries regarding Plaintiff's health; and (3) Plaintiff be transferred to another elementary school in the northern half of the county. (Letter from Joseph Meadows to Patrick Spicer, ECF No. 33-3, at 2–3.) In that same letter, Plaintiff's attorney stated that Defendant had "violated [Plaintiff's] rights under the Americans with Disability [sic] Act and consequently . . . created a hostile work environment." (*Id.* at 2.)

Defendant took two actions in response to the letter. First, at the request of Jeff Fradel, Senior Manager of Staff and Labor Relations for Defendant, Wayne Boyer, Coordinator of Internal Investigations for Defendant, initiated an investigation into Plaintiff's claim that Dr. Carpenter had harassed her and created a hostile work environment. (Fradel Aff., ECF No. 31-2, at 2; Harford Cty. Public Schools Managerial Inquiry, ECF No. 33-2, at 224–32.) Second, at Ms. Wernig's request, Plaintiff completed an "Employee Request for Accommodation under the Americans with Disabilities Act" form in which she requested: (1) a classroom close to teammates; (2) access to an elevator if needed; and (3) a transfer to another elementary school in the northern part of Harford County "due to harassment from Mr. Carpenter." (ECF No. 33-2, at 3.) Approximately two weeks later, Ms. Wernig interviewed Plaintiff regarding her requests for accommodation. According to Ms. Wernig's interview notes, Plaintiff indicated that her condition limited the major life activity of walking "but with use of crutches [she] c[ould] perform all job functions." (ADA Employee Questions, ECF No. 33-2, at 6.) Plaintiff also told Ms. Wernig that her symptoms were triggered by "temperature" and "stress" but she could perform all functions of her job with or without accommodations. (*Id.* at 6, 8.) On June 19, 2013, Ms. Wernig officially responded to Plaintiff's requests for accommodation and provided that Plaintiff would be placed in a classroom near her teammates and given access to the elevator

if needed.  (Letter from Melanie Wernig to Kourtney Hamel, *id.* at 4.)  In addition, the letter indicated that Plaintiff could use a chair while supervising children during free play.  (*Id.*)  The letter, however, was silent regarding Plaintiff's request for a transfer.  After following up by email regarding her request for a transfer, Plaintiff was informed by Ms. Wernig that a transfer was "not being provided as an ADA accommodation."  (Email from Melanie Wernig to Kourtney Hamel, June 27, 2013, 6:27 a.m., *id.* at 5.)

On July 9, 2013, shortly after Ms. Wernig had informed Plaintiff of the final resolution of her requests for accommodation, Mr. Boyer issued his investigation report.  (*Id.* at 24–32.)  As part of his investigation, Mr. Boyer conducted interviews with Plaintiff (in the presence of her attorney), Dr. Carpenter, Ms. Vohs, Ms. Dehoff, Ms. Wernig, and Margaret Weinbeck, the Instructional Facilitator at EES whom Plaintiff identified as a witness to certain of Dr. Carpenter's and Ms. Vohs's derogatory remarks about her.  (*Id.*)  Mr. Boyer concluded that Plaintiff's allegations were "unsubstantiated," and further found that Dr. Carpenter and Ms. Vohs had been "very supportive" of Plaintiff and "stated to her in a professional manner on many occasions if there is anything that she needs to please let the administration know."  (*Id.* at 32.)

### C.  Plaintiff's Retirement

On August 28, 2013, Dr. Carpenter held a meeting with teachers to announce a new initiative for teachers to volunteer to meet students at the local library and walk them to school in the morning.  (Carpenter Dep. Tr., ECF No. 31-2, at 226.)  Deborah Elliot, another member of Plaintiff's team, commented that Plaintiff would need a wheelchair to participate.[3]  (Hamel Dep. Tr., ECF No. 33-1, at 96.)  Plaintiff was embarrassed and upset by the comment and left the meeting crying.  (Carpenter Aff., ECF No. 32-1, at 132.)  Plaintiff refused to speak to any of her

---

[3]      Defendant contends that Ms. Elliot in fact said that she would need a wheelchair for herself because she had recently undergone joint-related surgery.  (Carpenter Aff., ECF No. 32-1, at 132.)

colleagues and instead waited for her father to pick her up. (*Id.*) Plaintiff did not return to EES after this incident. She took a series of paid and unpaid leaves and eventually entered disability retirement on January 31, 2015.

## II.     *Standard for Summary Judgment*

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. Fed. R. Civ. P. 56(c)(1)(A). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III.   *Analysis*

Plaintiff filed the instant suit on August 5, 2016, alleging that Defendant violated her rights under the ADA and the Rehabilitation Act by subjecting her to a hostile work environment

because of her disability and failing to provide her with reasonable accommodations. Defendant filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 arguing that Plaintiff's hostile-work-environment and failure-to-accommodate claims fail as a matter of law.[4]  Specifically, Defendant contends that Plaintiff's hostile work environment claims under the ADA and Rehabilitation Act fail because she cannot show that she was subjected to unwelcome harassment or that any such harassment was based on her disability.  And, even assuming that Plaintiff could show that she was harassed because of her disability, Defendant argues that no reasonable jury could conclude that the alleged harassment was objectively severe or pervasive, as required by law.  As to Plaintiff's failure-to-accommodate claim, Defendant argues that it provided Plaintiff with every accommodation she requested except one—her request for a transfer.  And Defendant contends that Plaintiff's transfer request was not reasonable because it was not related to the limitations imposed by her disability.  For the reasons set forth below, Defendant's motion will be granted.

## A. *Hostile Work Environment*

Although Plaintiff brings a hostile work environment claim under both the ADA and the Rehabilitation Act, her claims essentially collapse into one because the same standards apply under both statutes.  *See Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 413 (4th Cir. 2015) ("Employment discrimination claims brought under Section 504 [of the Rehabilitation Act] are evaluated using the same standards as those 'applied under [T]itle I of the Americans with Disabilities Act of 1990.'" (quoting 29 U.S.C. § 794)).

---

[4]     Plaintiff's complaint also alleges, as an independent ground for liability, that Defendant made impermissible disability-related inquiries of her in violation of the ADA, 42 U.S.C. § 12112(d)(4)(A).  (Complaint and Demand for Jury Trial, ECF No. 1, ¶ 40.)  In its motion for summary judgment, Defendant states that "it is entitled to judgment on *all claims* as a matter of law."  (ECF No. 31 (emphasis added).)  However, Defendant offers no argument with regard to Plaintiff's disability-related inquiry claim and therefore fails to carry its burden.  *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Accordingly, this claim shall proceed to trial.

In order to establish a hostile work environment claim under the ADA or the Rehabilitation Act, Plaintiff must prove that: "(1) [s]he is a qualified individual with a disability; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on h[er] disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to [her] employer." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001). Defendant concedes the first element—that Plaintiff is a qualified individual with a disability—but argues that Plaintiff has failed to produce sufficient evidence with regard to each of the remaining elements of her hostile work environment claim.

The second and third elements—that the Plaintiff suffered unwelcome harassment because of her disability—are the "gravamen" of Plaintiff's hostile work environment claim. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008). Without discriminatory *harassment*, there can be no hostile work environment. Neither the ADA nor the Rehabilitation Act defines the term "harassment"; therefore the Court looks to the ordinary meaning of the term.[5] *See, e.g.*, *Johnson v. Zimmer*, 686 F.3d 224, 232 (4th Cir. 2012) ("[W]ords that are not defined in the relevant statutory provisions are typically 'interpreted as taking their ordinary, contemporary, common meaning.' The Court 'customarily turn[s] to dictionaries for help in determining whether a word in a statute has a plain or common meaning.'" (first quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979), the quoting *Nat. Coalition for Students v. Allen*, 152 F.3d 283, 289 (4th Cir. 1998))). Harassment is defined as "[w]ords, conduct, or action (usu[ally] repeated or persistent) . . . directed at a specific person, [that] annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose; purposeful vexation."

---

[5]        Likewise, Title VII of the Civil Rights Act of 1964, which is the genesis of hostile work environment claims under the ADA and Rehabilitation Act, does not define the term harassment or abusive. *See* 42 U.S.C. § 2000e *et seq.*

*Harassment*, Black's Law Dictionary (10th ed. 2014); *see also harass*, Compact Oxford Dictionary 453 (7th ed. 1982) ("vex by repeated attacks").

Here, Plaintiff largely fails to meet her threshold burden. Even drawing all inferences in Plaintiff's favor, as the Court must, much of the conduct she complains of simply does not constitute harassment. For example, Plaintiff takes issue with the frequency of Dr. Carpenter's informal supervision of her in the classroom and hallways. However, the fact that Dr. Carpenter had a different management style than his predecessor does not mean that his day-to-day supervision of the teachers at EES amounted to harassment. The same is true with regard to the school events, policies, and classroom moves that Plaintiff alleges created a hostile work environment. Dr. Carpenter's apparent lack of consideration for Plaintiff's physical limitations when designing school events, while far from exemplary, does not equate to harassment of Plaintiff. Nor was it harassing for Dr. Carpenter to ask Plaintiff on one occasion if she would "like to try" to participate in the activity. Likewise, the evidence shows that Dr. Carpenter adopted and reinforced policies requiring teachers to pick up their own mail, supervise elementary school children in the hallways, and comply with state standardized testing chain-of-custody regulations; these policies are commonsense measures, not harassment.[6] While it is clear that this conduct caused Plaintiff "substantial emotional distress," Plaintiff has failed to present evidence that it was "directed" at her specifically or that it "serve[d] no legitimate purpose." *Harassment*, Black's Law Dictionary.

Moreover, to the extent that *any* of the above conduct may arguably constitute unwelcome harassment, Plaintiff has largely failed to establish that Defendant had a discriminatory animus— i.e., that the conduct was taken because of her disability. First, Plaintiff has not put forth

---

[6]     Other one-off incidents also fall under this category (e.g., Dr. Carpenter asking Plaintiff if a doctor looked at her ear when she had vertigo, Dr. Carpenter viewing Plaintiff's plan book on her desk, and Dr. Carpenter commenting that Plaintiff "must love having [her] condition because of [her] love of science").

sufficient evidence to support her belief that Dr. Carpenter subjected her to more supervision than her colleagues. Thus, to the extent that his supervision was harassing, it was equally harassing to Plaintiff and other, non-disabled teachers at EES. Second, Plaintiff has not presented any evidence—beyond her own belief—that the school activities she complains of were intentionally designed to exclude her. Third, the policies that Plaintiff complains of were applied equally to all teachers and Defendant has provided a legitimate, non-discriminatory explanation for each policy. The mail policy was adopted to ensure that confidential information shared with teachers remained private. (Carpenter Aff., ECF No. 31-2, at 131; Carpenter Dep. Tr., *id.* at 220–21.) The policy regarding distribution of standardized testing materials was adopted to ensure compliance with state regulations. (Vohs Dep. Tr., *id.* at 215–17.) And, as Plaintiff concedes, the hallway supervision policy predated Dr. Carpenter's tenure at EES, and the rationale for the policy needs no explanation. (ECF No. 33, at 6; ECF No. 33-4, at 10.) Plaintiff has not offered any evidence that Defendant's professed justifications for these polices are pretextual.

Additionally, although Dr. Carpenter's decision to move Plaintiff's classroom in 2011 *was* based on her disability, it is not clear how this constitutes harassment. Multiple teachers testified that their classrooms were moved at various times during their tenure, and Dr. Carpenter testified that he moved Plaintiff's classroom to the first floor to ensure that Plaintiff could safely evacuate her students in the event of an emergency. Plaintiff, however, does not explain (aside from her personal belief) how this single classroom move constituted harassment.[7] Instead, she merely

---

[7] Plaintiff's classroom was also moved a second time. In advance of the 2013–14 school year, she was moved back to the third floor in a location close to her teammates and the elevator. Plaintiff contends that this move was intended to harass her. Yet, just three months prior to the start of the 2013 school year, Plaintiff explicitly requested as an accommodation "a classroom close to teammates—and elevator if needed," noting that she and her teammates were "currently on 2 floors." (ECF No. 33-2, at 3.) That is exactly what she received. Plaintiff cannot now credibly allege that Defendant intended to harass her by granting the exact accommodation she sought.

states, without explanation, that Defendant's justification for the move "can be summarized only as convenient and disingenuous." (ECF No. 33, at 20.) But Defendant in fact provided a more than plausible explanation for the classroom move (i.e., safety) and Plaintiff offers no support for her alternative explanation (i.e., discrimination).

Putting aside these preliminary issues with much of the allegedly harassing conduct, Plaintiff's claim faces an additional insurmountable hurdle: The conduct at issue, taken together, simply is not sufficiently severe or pervasive to give rise to an actionable hostile work environment claim. "The 'severe or pervasive' element of a hostile work environment claim 'has both subjective and objective components.'" *Sunbelt Rentals, Inc.*, 521 F.3d at 315 (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc)). First, Plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Id.* (alteration in original) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). Second, she must show that "the conduct was such that 'a reasonable person in [her] position' would have found the environment objectively hostile or abusive." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)).

Courts consider a number of factors under the objective prong of the inquiry, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23). This is not "a mathematically precise test" and no single factor is dispositive. *Id.* (quoting *Harris*, 510 U.S. at 22). Rather, whether a hostile work environment exists ultimately depends on the totality of the circumstances. *Id.* ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully

captured by a simple recitation of the words used or the physical acts performed." (alteration in original) (quoting *Oncale*, 523 U.S. at 81–82)).

Plaintiff "must clear a high bar in order to satisfy the severe or pervasive test." *Id.* The ADA and Rehabilitation Act do not establish a "general civility code for the American workplace," *Oncale*, 523 U.S. at 80; rather, "to be actionable, the harassing 'conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment,'" *Sunbelt Rentals*, 521 F.3d at 315 (alterations in original) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Accordingly, a hostile work environment claim cannot rely merely on "rude treatment by [coworkers]," *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006), "callous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000). *See Faragher*, 524 U.S. at 78 (noting that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"); *see also Sunbelt Rentals, Inc.*, 521 F.3d at 315 ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard."). In short, the standard for proving a hostile work environment is intentionally "very high"; it is "designed to 'filter out complaints attacking "the ordinary tribulations of the workplace."'" *Wang v. Metropolitan Life Ins. Co.*, 334 F. Supp. 2d 853, 864 (D. Md. 2004) (quoting *Faragher,* 524 U.S. at 788).

It is beyond dispute that Plaintiff *subjectively* perceived Dr. Carpenter and Ms. Vohs's conduct to be hostile and abusive; however, no reasonable juror could conclude that the conduct at issue was *objectively* hostile or abusive. As previously noted, Plaintiff has failed to show that

much of this conduct (including the policy changes, school events, and classroom moves) amounted to harassment based on her disability.[8] This leaves Plaintiff to rely solely on three categories of conduct in support of her hostile work environment claim: (1) one ill-timed professional observation; (2) rude treatment (including glares, chuckling, and mocking the name of her condition to others); and (3) inquiries into her health and potential need for assistance. While this conduct, taken together, paints a picture of a challenging and perhaps less than welcoming work environment, it is not "so out of the ordinary as to meet the severe or pervasive criterion." *Sunbelt Rentals, Inc.*, 521 F.3d at 316. It simply does not meet the "very high," *Wang*, 334 F. Supp. 2d at 864, standard necessary to make out a hostile work environment claim. Indeed, Defendant's alleged conduct is a far cry from that which courts in this circuit have deemed severe or pervasive.

As support, Plaintiff cites two cases where courts found conduct was sufficiently severe or pervasive to give rise to an actionable hostile work environment claim; however, these cases only highlight the deficiencies in her claim. In the first case cited by Plaintiff, *Sunbelt Rentals*, the Fourth Circuit reversed a grant of summary judgment to the defendant, finding that the plaintiff was subjected to "religious harassment that was 'persistent, demeaning, unrelenting, and widespread.'" 521 F.3d at 316 (quoting *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997)). The plaintiff in *Sunbelt Rentals*, who was the defendant's lone Muslim employee, was repeatedly called "Taliban," "towel head," and "fake Muslim" by several coworkers. *Id.* His coworkers also challenged his allegiance to the United States (even though he was a military veteran), asking him "are you on our side or are you on the Taliban's side," and telling him that

---

[8] Even assuming all of this conduct too qualified as harassment based on Plaintiff's disability, all of the conduct together still does not satisfy the severe or pervasive standard. The school events and classroom moves were isolated incidents spread out over a three-year period. And the policy changes were one-time revisions that were neither harassing nor discriminatory on their face. This conduct does not alter the calculus.

if "you don't like America or where we stand, you can just leave." *Id.* He also learned, through an intermediary, that one coworker had said that if he ever caught the plaintiff praying at work, that it would be "the end of him." *Id.* The harassment was "an ongoing thing—*daily*," and took place in the time period immediately following September 11, 2001.[9] *Id.* (emphasis added). The Fourth Circuit noted that "any of the . . . incidents, viewed in isolation, would not have been enough to have transformed the workplace into a hostile or abusive one"; however, it found that the plaintiff was entitled to proceed to trial because he was subjected to "*constant* and *repetitive abuse* founded upon misperceptions that all Muslims possess hostile designs against the United States, that all Muslims support jihad, that all Muslims were sympathetic to the 9/11 attack, and that all Muslims are proponents of radical Islam." *Id.* at 318 (emphasis added).

The other allegedly analogous case cited by Plaintiff is *Rohan v. Networks Presentation LLC*, 192 F. Supp. 2d 434 (D. Md. 2002). *Rohan* is even less apposite than *Sunbelt Rentals*. In *Rohan*, the plaintiff alleged only a *single* incident of unwelcome harassment, however, it was so severe that the court found it was sufficient to withstand a motion to dismiss. Specifically, the plaintiff was

> forced to divulge to approximately 30 fellow cast members intimate personal details in order not to "jeopardize[ ]" her continued employment, including telling her co-workers that she is an "incest survivor," had been sexually abused by her father, suffers from mental impairments, and, as a result, takes medication and receives treatment from a mental health professional.

*Id.* at 438. *Rohan* stands for the proposition that even a single incident of harassment may be so severe that it satisfies the objective prong of the severe or pervasive test. But Plaintiff does not

---

[9] There was also evidence that the plaintiff's coworkers had called Muslim customers "a litany of derogatory names, including 'Bin Laden,' 'Hezbullah,' 'Ayatollah,' 'Kadaffi,' 'Saddam Hussein,' 'terrorist,' and 'sun nigger.'" 521 F.3d at 317. While not directed at the plaintiff, this discriminatory behavior supported his "assertion that the workplace was permeated with anti-Muslim hostility." *Id.*

allege a single severe instance of harassment; rather, she alleges a series of disparate, intermittent acts of indifference regarding her physical limitations.

The egregious nature of the conduct in *Sunbelt Rentals* and *Rohan* is similar to that in other cases in which the Fourth Circuit has found that harassment was sufficiently severe or pervasive to give rise to an actionable hostile-work-environment claim. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (finding that supervisor's "two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment"); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297 (4th Cir. 2004) (finding harassment sufficiently "severe or pervasive" to give rise to an actionable hostile-work-environment claim where "supervisors repeatedly called [plaintiff] and other black employees 'boy, jigaboo, nigger, porch monkey, Mighty Joe Young,' and 'Zulu warrior'"); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir. 2001) (finding that reasonable person could find conduct was severe or pervasive where African American plaintiff's supervisor "habitually called [him] a 'monkey,' 'dumb monkey,' and nigger,' and, "placed a picture of a monkey between the pages of a parts manual . . . . along with the notation 'so you'll never forget who you are'").

Defendant's purported conduct pales in comparison to that described above. Dr. Carpenter undoubtedly could have taken steps to make EES a more inclusive environment for Plaintiff and some of his alleged conduct was insensitive and rude. That said, "a general pattern of mere insensitivity" is not sufficient to give rise to a hostile-work-environment claim. *Fleetwood v. Harford Sys. Inc.*, 380 F. Supp. 2d 688, 704 (D. Md. 2005); *see Baqir*, 434 F.3d at 747 (affirming grant of summary judgment to defendant on plaintiff's hostile-work-environment claim and noting that "allegations that one [coworker] told [plaintiff] not to speak to him, that [supervisor]

did not communicate with [plaintiff], and that [supervisor] became agitated on one occasion are not facts that describe an 'abusive' environment"); *Brady v. Bd. of Educ. of Prince George's Cty.*, 222 F. Supp. 3d 459, 472 (D. Md. 2016) (granting summary judgment to defendant employer where school principal required plaintiff to provide doctor's note when she used sick leave, increased her work load, required her to attend distant trainings, publicly mocked her disability leading to students mocking her as well, and failed to hold meetings she requested), *aff'd*, 707 F. App'x 780 (4th Cir. 2018).

Nor do Plaintiff's allegations implicate any of the factors commonly considered under the objective prong of the severe or pervasive test. Those factors include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Fox*, 247 F.3d at 178. As an initial matter, most of Defendant's conduct was infrequent—over the course of three years, Dr. Carpenter designed a handful of physical activities that Plaintiff could not participate in fully, moved Plaintiff's classroom twice, inquired into her health on several occasions, chuckled at her once on the stairs, asked her if a doctor had looked in her ear, and made an insensitive comment about her prosthesis. This is a far cry from the *daily*, debilitating harassment other courts in this Circuit have found pervasive. And the conduct that was frequent—i.e., daily observation and dismissive treatment—simply does not qualify as *severe* under any reasonable objective standard. Last, none of the allegedly harassing conduct at issue was physically threatening, nor did it unreasonably interfere with Plaintiff's work performance. Indeed, Plaintiff repeatedly stated that she could perform all functions of her job in spite of the policies and behavior she now contends created a hostile work environment. In sum, while it is clear that Dr. Carpenter may have created an "unpleasant working

environment" for Plaintiff, it was not "a hostile or deeply repugnant one." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996).[10]

For the foregoing reasons, Defendant's motion for summary judgment will be granted as to Plaintiff's hostile-work-environment claims under the ADA and Rehabilitation Act.

### B. Failure to Accommodate

Plaintiff also alleges that Defendant failed to provide her with reasonable accommodations in violation of the ADA and the Rehabilitation Act. Specifically, Plaintiff contends that Defendant refused to grant her three reasonable accommodations: (1) assistance carrying testing materials; (2) access to an elevator; and (3) a transfer to another school.

Both the Rehabilitation Act and the ADA require employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) (holding that discrimination under Rehabilitation Act includes failure to accommodate and applying same standard as that used for ADA failure-to-accommodate claims).

To establish a prima facie case for failure to accommodate, Plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015) (alterations in original) (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)); s*ee Reyazuddin*, 789 F.3d at 414 (applying same standard to failure-to-accommodate claim under Section 504 of Rehabilitation Act). Defendant does not dispute the first two

---

[10] The Court need not address whether liability may be imputed to Defendant given that Plaintiff cannot show that she was subjected to a hostile work environment.

elements—(1) that Plaintiff is an individual with a disability and (2) that Defendant had notice of her disability. This case ultimately turns on the third element.

A reasonable accommodation is one that (1) "enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position," 29 C.F.R. § 1630.2(o)(1)(ii); or (2) "enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities, *id.* § 1630.2(o)(1)(iii). To satisfy her burden at this stage, Plaintiff must "present evidence from which a jury may infer that the [proposed] accommodation is 'reasonable on its face, i.e., ordinarily or in the run of cases.'" *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)). Additionally, she must put forth evidence that the accommodation sought "would be 'effective,' i.e., [it] would . . . address the job-related difficulties presented by [her] disability." *Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F. Supp. 720, 736 (D. Md. 1996) (citing 29 C.F.R. § 1630.2(o)(1)(i)–(ii)).

Plaintiff's accommodations fall under two broad categories: (1) those she claims Defendant should have granted before she explicitly requested them on May 14, 2013; and (2) one she claims Defendant unreasonably refused to grant after she explicitly requested it.

### 1. Accommodations Not Explicitly Requested

Although Plaintiff eventually explicitly requested *and received* assistance carrying testing materials and access to an elevator, she argues that she was entitled to these accommodations well before she formally requested them. Specifically, she contends that Defendant was on notice that she needed some sort of accommodation before she made her request and therefore was obligated to initiate a good faith discussion with her regarding her needs.

The ADA requires employers to engage in an "interactive process to arrive at a suitable accommodation collaboratively with the employee." *Summer v. Altarum Institute, Corp.*, 740 F.3d 325, 331 n.4 (4th Cir. 2014); *see Jacobs*, 780 F.3d at 581 ("The ADA imposes upon employers a good-faith duty 'to engage [with their employees] in an interactive process to identify a reasonable accommodation.'" (alteration in original) (quoting *Wilson*, 717 F.3d at 346)). This duty is *generally* "triggered" only after "an employee communicates her disability and desire for an accommodation." *Id.* In certain circumstances, however—such as where an employee's disability and need for an accommodation is readily apparent to the employer—"it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) ("What matters under the ADA [is] . . . whether . . . the employer can be fairly said to know of both the disability and desire for an accommodation.").

Plaintiff argues that Defendant had adequate notice of her disability and desire for accommodations and therefore should have initiated an informal, interactive process with her that would have resulted in the following reasonable accommodations: (1) assistance carrying testing materials and (2) access to an elevator. Plaintiff likely is correct that her disability was so obvious that it triggered Defendant's duty to proactively initiate an interactive process with her regarding these potential accommodations. Ultimately, whether such a duty was triggered is irrelevant, however, because the undisputed facts show that Defendant *did* attempt to "initiate, an informal interactive process," 29 C.F.R. § 1630.2(o)(3), with Plaintiff regarding her need for accommodations. Indeed, Defendant repeatedly asked Plaintiff—in different settings and

through different personnel—whether Plaintiff needed any accommodations.[11]  Yet, every time

Defendant did so Plaintiff gave the same response:  She rebuffed Defendant's inquiries and

insisted she could perform the essential functions of her job without any accommodations.

Plaintiff cannot now complain of Defendant's failure to provide that which she repeatedly

rejected.  The interactive process is a two-way street that Plaintiff failed to travel down, and, in

light of that, no reasonable juror could conclude that Plaintiff sought (or would have accepted) a

reasonable accommodation regarding carrying testing materials and access to an elevator prior to

May 14, 2013.[12]

### 2.  *Explicitly Requested Accommodation*

Plaintiff's remaining failure-to-accommodate claim stems from Defendant's denial of her

request for a transfer to a different school in the northern part of the county.  The parties largely

focus on the nexus—or lack thereof—between Plaintiff's disability and her request for a transfer.

Defendant contends that it is entitled to summary judgment because Plaintiff's request for a

transfer to another school was not causally related to her disability.  Plaintiff argues that her

transfer request was causally related to her disability because working at EES "caused [her] a

great amount of stress, which, in turn, exacerbated her physical disability."  (ECF No. 33, at 28.)

The ADA and Rehabilitation Act require employers to accommodate the physical or mental

*limitations* caused by an employee's disability.  *See* 42 U.S.C. § 12112(a)(5)(A) ("[T]he term

---

[11]     Defendant asked Plaintiff on at least four different occasions— February 16, 2012, October 23, 2012, July 5, 2012, and December 4, 2012— if she needed any accommodations due to her disability.  (ECF No. 31-2, at 239; ECF No, 33-1, at 97–99; ECF No. 33-2, at 17; ECF No. 33-4, at 12–13; ECF No. 33-5, at 13.)

[12]     Notably, the interactive process "is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position." *Wilson*, 717 F.3d at 347 (quoting *Rehling v. City of Chi.*, 207 F.3d 1009, 1015 (7th Cir. 2000)).  Thus, even assuming Defendant was obligated to "take some initiative," *Taylor*, 184 F.3d at 315, as it did, Plaintiff cannot escape her burden to show that the interactive process would have led to a *reasonable* accommodation.  *See, e.g.*, *Jacobs*, 780 F.3d at 581 ("[A]n employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position.").  And Plaintiff's refusal to accept *any* accommodation is the most compelling evidence imaginable that the interactive process would not have produced a *reasonable* accommodation.

'discriminate' includes . . . not making reasonable accommodations to the known physical or mental *limitations* of an otherwise qualified individual with a disability . . . ." (emphasis added)); 29 C.F.R. § 1630.9(a) ("It is unlawful for a covered entity not to make reasonable accommodation to the known physical or mental *limitations* of an otherwise qualified applicant or employee with a disability . . . ." (emphasis added)). Accordingly, "[t]here must be a causal connection between the major life activity that is limited and the [need for the] accommodation sought." *Wood v. Crown Redi–Mix, Inc.*, 339 F.3d 682, 687 (8th Cir. 2003); *see Felix v. New York City Transit Auth.*, 324 F.3d 102, 105 (2d Cir. 2003) ("[A]n employer discriminates against an employee with a disability only by failing to provide a reasonable accommodation for the 'disability' which is the impairment of the major life activity."); *see also Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) ("[T]he ADA requires employers to reasonably accommodate *limitations*, not disabilities."); *Long v. Howard Univ.*, 439 F. Supp. 2d 68, 78 (D.D.C. 2006) ("[I]t is the limitation arising from the disability that determines the need for accommodation, not merely the existence of the disability.").[13] In other words, an accommodation must be sought as a means to alleviate disability-induced limitations that impact an employee's job-related activities. *See Danielle-Diserafino v. Dist. Sch. Bd. of Collier Cty., Fla.*, No. 2:15-CV-569-FTM-29CM, 2016 WL 4247633, at *4 (M.D. Fla. Aug. 11, 2016) (noting that "accommodations requested must have been sought for the purpose of alleviating the workplace effect of the impairment"); *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 143–44 (D.D.C. 2004) (noting that "accommodation must be tied to a specific disability raised by a plaintiff in his or her request for accommodation" and granting summary judgment to defendant because plaintiff failed to "demonstrate[] that working from home is a reasonable

---

[13]     The Fourth Circuit has yet to stake a position regarding the requisite nexus between an individual's disability-induced limitations and the specific accommodation sought.

accommodation *responsive to* her multiple sclerosis, glaucoma or optic neuritis" (emphasis added)), *amended on reconsideration on other grounds*, 400 F. Supp. 2d 257 (D.D.C. 2005).

The Court assumes that Plaintiff is an individual with a disability as defined by the ADA because she has "a physical . . . impairment that substantially limits one or more major life activities." Specifically, her Ehlers-Danlos Syndrome limits the major life activities of "walking, bending, standing, sitting, all forms of mobility, sleeping, and caring for herself." (Complaint and Demand for Jury Trial, ECF No. 1, ¶ 4.) Accordingly, these specific limitations "determine[] the need for accommodation." *Long*, 439 F. Supp. 2d at 78. Therefore, at a minimum, Plaintiff must show that her requested accommodation is related to her physical limitations—i.e., it is plausible that had the accommodation been granted it would have alleviated her physical limitations and allowed her to perform an essential job function or enjoy "equal benefits and privileges of employment" she otherwise could not.

Plaintiff has not presented any evidence that her physical limitations prevented her from working at EES or from otherwise enjoying "equal benefits and privileges of employment" as other teachers at EES. To the contrary, she repeatedly asserts that she requested a transfer not because of her physical limitations but rather because "she faced harassment from Dr. Carpenter and Ms. Vohs as a result of her physical disability." (ECF No. 33, Ex. XX ("It was the harassment is why I asked for a transfer."); (Q: Are you still claiming that you needed a transfer to the northern part of the county because of the distances you were able to travel? A: No. I needed a transfer due to the harassment.").) In other words, the driving force behind Plaintiff's request for accommodation was *Defendant's* alleged harassment and not *Plaintiff's* physical limitations.

Plaintiff's current attempt to connect her transfer request to her disability is both too little and too late. In essence, she argues that working at EES caused her physical limitations, or, more accurately, a heightened version of her limitations. (ECF No. 33, at 27 ("The harassment caused Ms. Hamel a great amount of stress, which exacerbated her physical disability and necessitated a transfer to another school.").) As an initial matter, this post hoc argument is not relevant because Plaintiff failed to put Defendant on notice at the time of her original request that a transfer was related to her claimed disability. *See Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012) (explaining that employee is obligated to provide employer "not only notice of a condition, but of a 'causal connection between the major life activity that is limited and the accommodation sought'"). Plaintiff consistently told Defendant that she was seeking a transfer due to harassment from Dr. Carpenter; she never linked the request to her physical limitations as she attempts to do now. (Employee Request for Accommodation under the Americans with Disabilities Act, ECF No. 33-2, at 3 (requesting "a transfer to another elementary school in Northern part of county due to harassment from Mr. Carpenter"); Letter from Eric McLauchlin to Jeffrey Fradel, Aug. 20, 3013, ECF No. 33-3, at 12 ("I am seeking a transfer for Ms. Hamel as a way to avoid further conflict and further violations of the law.").)[14] Likewise, Plaintiff's medical provider gave no indication that a transfer to another school was

_____

[14]     In November 2013, Plaintiff's then attorney sent an email to Jeffrey Fradel apparently asserting a new, unidentified medical condition as grounds for a transfer. In the email, Mr. McLauchlin wrote,

> Last week I received information from Ms. Hamel's medical providers demonstrating that her Principal is the cause of her current medical conditions (unrelated to Ehlers-Danlos Syndrome). I believe this makes a request to accommodate her by relocating her a request that fits squarely within the ADA. Please consider that with Ms. Wernig and advise how best we should formalize the request.

(Email from Eric McLauchlin to Jeffrey Fradel, Nov. 12, 2013, ECF No. 33-3, at 17.) It is not clear that this new request was ever formalized. In any event, it simply highlights Plaintiff's misunderstanding of the requisite nexus between her physical limitations and requested accommodation. The email does not explain the nature of Plaintiff's "current medical conditions," whether those conditions constitute a disability under the ADA, and, if so, how the accommodation would alleviate the specific job-related difficulties presented by her disability.

necessary to alleviate her physical limitations. (ADA Medical Questionnaire, ECF No. 31-2, at 33–37 (noting that Plaintiff's condition is "irreversible and progressive" but that she could perform most essential job functions with use of crutches, access to an elevator, and a classroom close to teammates).

Plaintiff, however, suggests that Defendant was on notice that her transfer request was related to her disability. In support of this argument, Plaintiff cites to a mere scintilla of evidence: (1) multiple doctor's notes she submitted between September 2013 and May 2014 which indicated that she could not return to work due to "continued complications of Ehlers Danlos Syndrome and stress reaction," and (2) notes from her interview with Melanie Wernig which indicated that her condition was triggered by "stress." Plaintiff contends that these fleeting references to "stress" put Defendant on notice that her transfer request was in fact causally related to her disability-induced physical limitations. Plaintiff asks too much of Defendant. First, the doctor's notes seem to indicate that Plaintiff was suffering from two distinct issues: (1) complications from her disability, and (2) a stress reaction. The notes justified Plaintiff's continued absence from work for medical reasons at a time when she was taking paid and unpaid leave; they did not purport to provide a basis for a transfer to another school. While the notes are far from clear, they certainly did not put Defendant on notice that Plaintiff was seeking a transfer as a reasonable accommodation for job-related difficulties caused by her disability-induced physical limitations. Likewise, Ms. Wernig's single, offhand reference to stress triggering Plaintiff's condition cannot reasonably be viewed as notice to Defendant that Plaintiff's request for a transfer was related to her physical limitations.

Finally, even assuming Plaintiff had informed Defendant that she was seeking a transfer because stress from working at EES was contributing to her condition, her failure-to-

accommodate claim still fails as a matter of law. The fact that Plaintiff has Ehlers-Danlos Syndrome and working at EES may have exacerbated the symptoms of her condition is not itself justification for a transfer (or any other accommodation). To the contrary, "it is the *limitation arising from the disability* that determines the need for accommodation, not merely the existence of the disability." *Long*, 439 F. Supp. 2d at 78. In other words, Plaintiff must show that a transfer to another school was designed to alleviate a specific physical limitation that impaired her ability to perform an essential job function or to enjoy "equal benefits and privileges of employment."[15] Yet she has not alleged or argued that *her physical limitations caused* her to experience certain job-related difficulties that would have been alleviated by a transfer. Rather, she has flipped the causation analysis on her head, arguing instead that *stress from her job caused* her to experience certain physical symptoms related to her condition. But whether a transfer would have reduced Plaintiff's symptoms is irrelevant on its own. *See, e.g.*, *Fink v. Richmond*, 405 F. App'x 719, 723 (4th Cir. 2010) (noting that "the ADA and the Rehabilitation Act do not require that an employer provide a disabled employee with a perfect accommodation or an accommodation most preferable to the employee"). Plaintiff was obligated to put forth some evidence that her *physical limitations* limited her ability to work at EES, but not other elementary schools in the county. Plaintiff has failed to do so.

---

[15]     Plaintiff also asserts that Defendant failed to engage in an interactive process regarding her request for a transfer. Plaintiff appears to assert this as an alternative and independent ground for liability. "But the interactive process 'is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought.'" *Wilson*, 717 F.3d at 347 (quoting *Rehling*, 207 F.3d at 1015).

> Likewise, "liability for failure to engage in an interactive process depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." In this regard, [plaintiff] cannot escape the requirements of his prima facie failure-to-accommodate claim.

*Wilson.*, 717 F.3d at 347. Plaintiff has failed to establish her prima facie failure-to-accommodate claim; therefore, Defendant's alleged failure to engage in the interactive process is irrelevant.

For the foregoing reasons, Defendant's motion for summary judgment will be granted as to Plaintiff's failure-to-accommodate claims under the ADA and Rehabilitation Act.

## IV.  *Conclusion*

For the foregoing reasons, an Order shall enter GRANTING Defendant's Motion for Summary Judgment (ECF No. 31).

DATED this 22nd day of March, 2018.

BY THE COURT:

_____/s/_____

James K. Bredar
Chief Judge